FILED

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

00 APR 24 AM

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| MICHAEL JOEL PENNINGTON, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | CV98-H-2026-NE |
| CITY OF HUNTSVILLE, ALABAMA, | ) | |
| DEFENDANT. | ) | |

**ENTERED**

APR 2 4 2000

### MEMORANDUM OF DECISION

The Court has before it the January 10, 2000 motion of the defendant, the City of Huntsville, Alabama, for summary judgment. Pursuant to the Court's January 11, 2000 order, as amended by the Court's January 26, 2000 order, the motion was deemed submitted, without oral argument, on February 22, 2000.

### I. Procedural History

Plaintiff Michael Joel Pennington commenced this action on July 27, 1998 by filing a pro se complaint[1] alleging racial discrimination and also alleging religious retaliation. (See Compl. 4-5.) An amended complaint was filed on October 20, 1999. The amended complaint also alleged employment discrimination on

---

[1] The plaintiff also sought permission to proceed without paying filing fees.

the basis of race and retaliation based upon prior requests and

grievances concerning religious accommodation, and sought to

raise claims under Title VII, 42 U.S.C. § 1981, 42 U.S.C. § 1983,

and the equal protection and due process clauses of the

Fourteenth Amendment.[2]  (See Am. Compl. passim.)  More

specifically, the amended complaint stated that the plaintiff

initially had been denied a promotion and that plaintiff later

had been offered a promotion but on different terms than an

employee of another race, both as a result of discrimination and

retaliation.  (See Am. Compl. ¶¶ 8-19.)  In response, defendant's

January 10, 2000 motion for summary judgment asserts that no

genuine issues of material fact exist and that the defendant is

entitled to judgment as a matter of law.  (See Def.'s Mot. Summ.

J. 1.)

     The parties have each filed briefs and submitted copious

evidence in support of their respective positions concerning the

pending motion for summary judgment.  On February 1, 2000, the

---

     [2] Plaintiff has now withdrawn his claims under the due
process clause of the Fourteenth Amendment.  (See Pl.'s Br. 3
n.1.)  Therefore, any due process aspects of the instant case
need not and will not be discussed further.

defendant submitted evidence[3] in support of its motion, and on
February 8, 2000, the defendant filed a supporting brief.  On
February 15, 2000, the plaintiff submitted evidence[4] in

_____

[3] The defendant submitted the December 1, 1999 deposition of
plaintiff Michael Joel Pennington; the plaintiff's application
for employment with the defendant; excerpts from the plaintiff's
personnel file (Documents 0000162-63); the defendant's personnel
manual; an undated class specifications for the position of
neighborhood services programmer; a May 1999 class specification
for the position of neighborhood services programmer; a June 1995
promotional procedure for the position of neighborhood services
programmer; an April 16, 1996 memorandum from Charles E. Perry to
Betty Smith; a document headed "Interview Questions Recreation
Programmer June 10, 1999"; a July 2, 1996 memorandum from Mia L.
Puckett to Richard Liles (Documents 002179-80); a July 11, 1996
letter from Mia L. Puckett to the plaintiff; a July 17, 1996
memorandum from Richard Liles to Terry Hatfield (Document
000797); handwritten notes of Mia L. Puckett; handwritten notes
of Joey Flanders; an August 19, 1996 memorandum from Richard
Liles to the plaintiff; an August 23, 1996 memorandum from the
plaintiff to Richard Liles; a November 22, 1996 memorandum from
Terry Hatfield to the plaintiff; a transcript of the plaintiff's
January 9, 1997 show cause hearing with attached additional
documents; a January 23, 1997 memorandum from the defendant's
Personnel Committee to the plaintiff; the plaintiff's August 21,
1996 EEOC charge; the defendant's September 20, 1996 response to
the notice of plaintiff's EEOC charge; the January 4, 2000
deposition of Richard Liles; the December 8, 1999 deposition of
Mia Puckett; the December 7, 1999 deposition of Ralph Stone; and
the December 7, 1999 deposition of Tony Hughes.

[4] The plaintiff submitted the defendant's "Promotion,
Demotion, Transfer" policy; a list of the defendant's employee
grievance hearings since January 1, 1994; undated class
specifications for the positions of recreation aide and
neighborhood services programmer; May 1999 class specifications
for the positions of recreation aide and neighborhood services
programmer; an August 23, 1994 memorandum from Tony Hughes to
Betty Smith; an August 23, 1994 memorandum from Tony Hughes to

opposition to the defendant's motion.  The plaintiff supplemented

his evidentiary submissions on February 17, 2000.[5]  Finally,

---

the plaintiff; an October 5, 1994 memorandum from Betty Smith to
Richard Liles; an October 25, 1994 memorandum from the
defendant's Personnel Committee to the plaintiff; a November 1,
1994 memorandum from Mia L. Puckett to Betty Smith; a November 2,
1994 memorandum from Charles Perry to Jim Putnum; a November 3,
1994 memorandum from Betty Smith to Mia L. Puckett; a December
16, 1994 memorandum from Richard Liles to Betty Smith; a December
21, 1994 memorandum from the defendant's Personnel Committee to
the plaintiff; a December 22, 1994 memorandum from John W.
Laughinghouse to Richard Liles; a December 22, 1994 memorandum
from Tony Hughes to Richard Liles; a June 6, 1995 document headed
"Promotional Procedure for Position of Neighborhood Services
Programmer"; a July 5, 1995 memorandum from Charles Perry to the
plaintiff; March 1996 applications for the position of
neighborhood services programmer; an April 16, 1996 memorandum
from Betty Smith to Charles Perry; a document labeled "Interview
Questions Recreation Programmer June 10, 1996"; a June 11, 1996
memorandum from Tony Hughes to John Mayes; the plaintiff's June
19, 1996 grievance; a June 26, 1996 memorandum from Betty Smith
to the plaintiff; a July 2, 1996 memorandum from Mia L. Puckett
to Richard Liles; a July 11, 1996 letter from Mia L. Puckett to
the plaintiff; an August 19, 1996 memorandum from Richard Liles
to the plaintiff; an August 19, 1996 memorandum from Betty Smith
to Richard Liles; the plaintiff's August 21, 1996 EEOC charge; an
April 9, 1997 letter from defendant's City Council to the
plaintiff; an August 23, 1996 memorandum from the plaintiff to
Richard Liles; the transcript of the plaintiff's August 29, 1996
show cause hearing; an October 4, 1996 memorandum from Mia L.
Puckett to Richard Liles; the August 20, 1997 meeting agenda for
the Scruggs Community Center; notes discussing Tony Hughes
(Documents 000782-84); notes discussing neighborhood services
programmer applicants' objective qualifications (Documents
001041-42); the plaintiff's November 14, 1996 grievance appeal
form; and Documents 000729-30, 000741-45, 000753-54, 000756-60,
000763-70, 000772, 000778, 000782-85, and 000795-97.

    [5] The Plaintiff filed the second page of a December 22, 1994
memorandum from Tony Hughes to Richard Liles and a July 17, 1996

plaintiff filed an opposing brief on March 14, 2000.  The issues having been thoroughly briefed, the defendant's motion for summary judgment is now ripe for decision.

### II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always has the initial responsibility of stating for the court the grounds for the motion and of pointing out those portions of the pleadings or other filings which it feels show the nonexistence of any genuine issues of material facts.  See id. at 323.  Once the moving party has met his burden, Rule 56(e) mandates that the non-movant must "go beyond the pleadings and by h[is] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324 (quoting Rule 56).

------

memorandum from Betty Smith to Claudia Anderson.

The appropriate substantive law will guide the determination of which facts are material and which are simply irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  See Anderson, 477 U.S. at 248.  But "[i]f the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted.  Id. at 249-50 (citations omitted).

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can meet its initial burden on summary judgment only by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e., facts "that would entitle it to a directed verdict if not controverted at trial."  Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the

6

burden shifts to the non-moving party to produce "significant, probative evidence" presenting a genuine issue of material fact for trial.  Id. at 1115-16.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  See id.  First, the moving party may produce affirmative evidence negating a material fact, thus showing that the opposing party will be not be able to meet the necessary elements of its case at trial.  See id. at 1116.  Once the moving party satisfies its burden using this method, the non-moving party must counter with enough positive evidence to overcome a trial motion for a directed verdict.  See id.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  See id. at 1115-16.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to notify the court that sufficient evidence to support the non-moving party's case is lacking.  See Fitzpatrick, 2 F.3d at 1115-

7

16.   If the movant meets its initial burden by using this second method, the non-moving party may either identify for the court record evidence not noted by the movant but sufficient to overcome a directed verdict, or the non-moving party "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency."   <u>Id.</u> at 1116-17.   However, when responding to the motion, the non-movant may not rely on bare allegations of wrongdoing, but must come forward with some evidence of specific facts.   <u>See</u> <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts

As part of a proposed pretrial order, the parties submitted to the Court an agreed summary of the case.   At the February 22, 2000 pretrial conference, both parties again reviewed and concurred in the agreed summary, which was incorporated into the Court's pretrial order.   (<u>See</u> Feb. 22, 2000 Order 2-3.)   Because the parties' summary is a fair and succinct recital of the undisputed facts of the case, the Court will set forth a somewhat condensed version of the relevant portions.

The plaintiff is a black male employed by the defendant City of Huntsville.   Since 1988, the plaintiff has worked as a

8

recreational aide, first on a part-time basis and later on a
full-time basis.  Until the winter of 1995, the plaintiff was
assigned to the defendant's Scruggs Center.  In 1994, however,
the plaintiff filed a grievance seeking a religious accommodation
and was then transferred to the Westside Center.  (See Feb. 22,
2000 Order 2.)

The plaintiff later applied for a position as a neighborhood
services programmer with the defendant in March of 1996.  Five
people, including the plaintiff, were certified to be interviewed
for the opening.  Following the interviews, Joey Flanders, a
white male, was chosen to fill the position.  Plaintiff then
filed a grievance, on June 19, 1996, alleging that he had been
denied the promotion because of retaliation and because of racial
discrimination.  The defendant's own Equal Employment Officer
concluded that the plaintiff's prior request for a religious
accommodation had been improperly considered in filling the
neighborhood services programmer position.  (See Feb. 22, 2000
Order 2.)

Following the Equal Employment Officer's findings, the job
offer to Flanders was rescinded.  (See Feb. 22, 2000 Order 2.)
Richard Liles, who headed the Parks and Recreation Department,
then conducted new interviews for the position.  (See Feb. 22,

2000 Order 2-3.)   After the new interviews, Flanders was again
offered a job as a neighborhood services programmer at the
Scruggs Center, but, this time, the plaintiff was also offered a
position as a neighborhood services programmer at another center.
However, the plaintiff's offer was subject to conditions not
imposed upon the offer extended to Flanders.   (See Feb. 22, 2000
Order 3.)   Although not mentioned in the parties' summary, it is
also undisputed that Liles eventually requested that the
plaintiff indicate his acceptance of the offer, with all attached
conditions, in writing and that the plaintiff responded that he
would accept only when the defendant placed the conditions
attached to the job offer in writing.   (See Aug. 19, 1996 Liles
Mem.; Aug. 23, 1996 Pennington Mem.)   Neither the plaintiff nor
the defendant ever supplied the other with the requested
documents.

### IV. Applicable Substantive Law and Analysis

As noted previously, plaintiff's amended complaint asserts
employment discrimination claims under Title VII, under 42 U.S.C.
§ 1981 as enforced through 42 U.S.C. § 1983, and under the equal
protection clause of the Fourteenth Amendment as enforced through
42 U.S.C. § 1983.   All of the plaintiff's claims are premised,
essentially, upon two incidents from the late spring and summer

10

of 1996:  the defendant's initial decision not to promote

plaintiff to the position of neighborhood services programmer[6]

and the defendant's later decision to extend a conditional offer

of promotion to the same position.  Because plaintiff's various

theories of recovery all relate to the same incidents, the Court

will, for the sake of clarity, discuss only the Title VII claims,

but notes that the outcome is the same for the corresponding

section 1981 and section 1983 claims.[7]  The Court will address

---

[6] The Court notes that the plaintiff's section 1981 and 1983
claims relating to the initial failure to promote appear to be
time barred as the selection of plaintiff's comparator occurred
no later than the middle of June of 1996 but plaintiff's initial
complaint was not filed until July 27, 1998, and his amended
complaint was not filed until October 20, 1998, both dates being
more than two years after the incident.  See Ala. Code § 6-2-
38(l) (1993) (providing for a two-year statute of limitation for
personal injury actions); Goodman v. Lukens Steel Co., 482 U.S.
656, 660-61 (1987) (holding that state personal injury statutes
of limitation apply to section 1981 as well as section 1983
claims); Wilson v. Garcia, 471 U.S. 261, 276-79 (1985) (holding
that, for section 1983 claims, federal courts are to borrow the
appropriate state law statute of limitation for personal injury
claims); Patterson v. Augat Wiring Sys., Inc., 944 F. Supp. 1509,
1518 (M.D. Ala. 1996) (noting the applicability of Alabama's two-
year personal injury statute of limitation). However, given the
Court's ultimate decision in this case, this statute of
limitation issue need not be addressed in any greater detail.

[7] The elements and evaluation of section 1981 and section
1983 claims are identical to the elements and evaluative
structure found in Title VII cases.  See Standard v. A.B.E.L.
Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both of
these statutes [Title VII and section 1981] have the same
requirements of proof and use the same analytical framework,

plaintiff's claims in reverse chronological order, starting with the conditional promotion. First, however, a discussion of the appropriate analytical framework is necessary.

The analysis of the plaintiff's claims will be determined not only by the nature of the allegations but also by the quality of the evidence offered in support of those claims. See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) (noting that "[t]he analytical framework and burden of production var[y] depending on the method of proof chosen"). In general, a plaintiff may attempt to establish a case of employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics. See id.; Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989) (ADEA case). See also Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999) (recognizing the availability of either direct or circumstantial evidence). A plaintiff's ability to proceed through the use of

---

therefore we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well."); Richardson v. Leeds Police Dept., 71 F.3d 801, 805 (11th Cir. 1995) ("In a case such as this alleging disparate treatment, in which § 1983 is employed as a remedy for the same conduct attacked under Title VII, '"the elements of the two causes of action are the same."'" (quoting Cross v. State of Ala., 49 F.3d 1490, 1508 (11th Cir. 1995) (quoting Hardin v. Stynchcomb, 691 F.2d 1364, 1369 n.16 (11th Cir. 1982)))).

circumstantial evidence of discrimination is necessarily

important because direct proof of discrimination is uncommon.

See Combs v. Plantation Patterns, 106 F.3d 1519, 1537 (11th Cir.

1997); Grigsby v. Reynolds Metals Co., 821 F.2d 590, 595 (11th

Cir. 1987).  Direct evidence is "[s]uch evidence [which], if

believed, proves the existence of a fact in issue without

inference or presumption."  Burns v. Gadsden State Community

College, 908 F.2d 1512 (11th Cir. 1990).  Cf. Wright v. Southland

Corp., 187 F.3d 1287, 1293-94 (11th Cir. 1999) (per Tjoflat, J.)

(defining direct evidence as "evidence from which a reasonable

trier of fact could find, more probably than not, a causal link

between an adverse employment action and a protected personal

characteristic" and finding the outcomes reflected in prior case

law consistent with that definition).  However, direct evidence

does not include "stray remarks in the workplace" or "statements

by nondecisionmakers" or "statements by decisionmakers unrelated

to the decisional process itself."  Price Waterhouse v. Hopkins,

490 U.S. 228, 277 (O'Connor, J., concurring) (1989).  See also

EEOC v. Alton Packaging Corp., 901 F.2d 920, 924 (quoting Price

Waterhouse).

Here, the plaintiff asserts that he has direct evidence of

discrimination and of retaliation.  The plaintiff offers that the

decision-makers were aware of his prior requests and complaints
concerning his religious accommodation; that Richard Liles
testified that Betty Smith, the Recreation Services Manager,
seemed annoyed when informed that the plaintiff was to be given a
religious accommodation; that Richard Liles testified that he
would have expected Tony Hughes, the Recreation Services Zone
Coordinator, to be more annoyed than Smith as Hughes was quick-
tempered; that the plaintiff's scores on the initial screening
measure were higher than those of Joey Flanders, who was
initially offered a position as a neighborhood services
programmer; that Hughes found what he considered to be negative
information when reviewing the plaintiff's personnel file; that
Mia Puckett, the defendant's Equal Employment Officer, believed
that retaliation based on the plaintiff's prior religious
accommodation (but not racial discrimination) had influenced the
initial decision regarding the programmer position; that Liles
was aware of and even involved in the prior dispute over
religious accommodation; and that Liles placed conditions on the
plaintiff's promotion and also proposed an assignment to the
Calvary Hills Center rather than to the Scruggs Center.  (See
Pl.'s Br. 23-25.)  A mere cursory review of the plaintiff's
supposedly direct evidence reveals that it is no more than

14

indirect or circumstantial evidence of discrimination and retaliation, as "courts have found only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [an illegal criterion], to constitute direct evidence of discrimination." Carter, 870 F.2d at 582 (footnote omitted). See also Schoenfeld, 168 F.3d at 1266 (quoting Carter, 870 F.2d at 582). None of the evidence cited by plaintiff so clearly denotes an impermissible animus as to be direct evidence of discrimination or retaliation.

First, simple consciousness of prior complaints by the employee alone is not direct evidence of a retaliatory or discriminatory intent; indeed, basic knowledge of prior protected activities is most relevant to a circumstantial showing of retaliation. See, e.g., Raney v. Vinson Guard Serv., Inc., 120 F.3d 1192, 1197 (11th Cir. 1997) (stating that, at a minimum, bare knowledge of protected activity by the defendant is required as part of a circumstantial case of retaliation). Nor are Liles's observations about Smith and Hughes direct evidence. First, neither Smith nor Hughes ever flatly stated that she or he was annoyed at the plaintiff because of his previous religious accommodation; Liles inferred that they were annoyed at the plaintiff based on Hughes's general demeanor and based on Smith's

15

attitude when she was informed of the decision to accommodate

plaintiff.  That Liles's observations about Hughes and Smith even

suggest an improper animus toward the plaintiff is the result of

an inference (whether by Liles or the plaintiff or anyone else),

which is the very definition of circumstantial evidence.  <u>See</u>

<u>Schoenfeld</u>, 168 F.3d at 1266 (defining circumstantial evidence as

that which "at best merely suggests a discriminatory motive");

<u>Early v. Champion Int'l Corp.</u>, 907 F.2d 1077, 1081-82 (11th Cir.

1990) ("[T]he evidence at issue here, at most, <u>suggests</u>

discrimination, leaving the trier of fact to <u>infer</u> discrimination

based upon the evidence; by definition then, the evidence is

circumstantial."); <u>Young v. General Foods Corp.</u>, 840 F.2d 825

(11th Cir. 1988) (finding that comment that plaintiff was the

same age as a superior's father was not direct evidence of

discrimination because plaintiff had to infer a discriminatory

meaning to an otherwise neutral comparison).  Second, any

expressions of annoyance were not directly related to the

decision-making process in regard to the promotion, which took

place two years later.  <u>See Price Waterhouse</u>, 490 U.S. at 277

(O'Connor, J., concurring) (stating that comments by decision-

makers but unrelated to the decision-making process are not

direct evidence); <u>Alton Packaging</u>, 901 F.2d at 924 (quoting <u>Price</u>

Waterhouse).  Furthermore, any comments made by Smith or any

emotions displayed by her in reaction to the plaintiff's

religious accommodation are irrelevant as she was not really a

decision-maker.[8]  See Price Waterhouse, 490 U.S. at 277

(O'Connor, J., concurring) (observing that comments made by

someone other than a decision-maker are not direct evidence);

Alton Packaging, 901 F.2d at 924 (quoting Price Waterhouse).

Similarly, Mia Puckett's conclusion (apparently based in large

part upon her conversations with Tony Hughes) that retaliation

based upon the plaintiff's earlier grievances regarding religious

accommodation had affected the initial decision are not direct

evidence as they are the inferences drawn by one not involved in

the decision-making process.  See Price Waterhouse, 490 U.S. at

277; Early, 907 F.2d at 1081-82; Alton Packaging, 901 F.2d at 924

(quoting Price Waterhouse).

Plaintiff also argues that the alleged statements by Hughes

that Puckett noted in the course of her investigation and that

---

[8] As the plaintiff has convincingly argued, Hughes was the
de facto decision-maker in regard to the initial decision not to
promote the plaintiff, as he selected Flanders for the positions
and Smith merely "rubber-stamped" his choice.  (See Pl.'s Br. 14;
July 2, 1996 Puckett Mem.)  Smith and the rest of her staff were
excluded completely from the later decision, by Liles, to offer
the plaintiff a conditional promotion.  (See Aug. 19, 1996 Smith
Mem.)

17

formed a basis for her conclusions are direct evidence of
retaliation.  Hughes supposedly told Puckett that the plaintiff's
personnel file contained some negative information and that a
review of the file revived unpleasant memories concerning the
plaintiff's reaction to a prior transfer, which was made as part
of an attempt to provide the plaintiff with a requested religious
accommodation.  (See Puckett Notes (Docs. 000782-83); Puckett
Dep. 74-77.)  Although Puckett concluded that Hughes's statements
revealed an unintentional but impermissible bias, her role, in
keeping with the spirit of her position as an Equal Employment
Officer, was basically that of a zealous advocate for the
complaining employee; when viewed by a more detached observer but
still taking the facts, as a whole, in the light most favorable
to the plaintiff, Hughes's alleged statement is not the type of
unmistakably discriminatory utterance that constitutes direct
evidence.[9]  See Carter v. City of Miami, 870 F.2d 578, 582 (11th

---

[9] Although not necessary to the outcome of the present
matter, the Court notes that Puckett's conclusions almost
certainly would not be admissible at trial under Federal Rule of
Evidence 403.  See Fed. R. Evid. 403 ("Although relevant,
evidence may be excluded if its probative value is substantially
outweighed by the danger of unfair prejudice, confusion of the
issues, or misleading the jury, or by considerations of undue
delay, waste of time, or needless presentation of cumulative
evidence.").  Her findings are but marginally probative given her
detachment from the actual decision-making process, yet they are

Cir. 1989) (describing the type of remarks that constitute direct evidence); Schoenfeld, 168 F.3d at 1266 (quoting Carter, 870 F.2d at 582). Indeed, no impermissible motives are detectable. Hughes never stated to Puckett that he was displeased that the plaintiff sought or was awarded an accommodation or even intimated that he considered the fact that plaintiff had filed a grievance in connection with his pursuit of the accommodation; what Hughes considered negative was the documentation concerning the plaintiff's reaction to being transferred, which incidentally happened to be part of the accommodation that the plaintiff was granted. (See Puckett Notes (Doc. 000783); Puckett Dep. 75-77.) Hughes was displeased not because the plaintiff had engaged in any protected activity but because of the plaintiff's attitude in reacting to the change in his work assignment.

That leaves plaintiff's evidence that he had higher scores on the initial screening device than did Flanders and that Liles

---

highly prejudicial because of her then-position as the defendant's own Equal Employment Officer and patently unfair because the nature of her position virtually mandated that she advance the interests of the purportedly aggrieved employee over those of her own employer, the defendant. The Court is also concerned that allowing Puckett's conclusions into evidence would have a chilling effect on employer's willingness to establish and maintain independent Equal Employment Officers to assist in the laudable goal of promoting a workplace free from illegal employment practices.

placed certain conditions on the plaintiff's promotion not placed
on Flanders's promotion and decided to assign the plaintiff to a
center other than the plaintiff's first choice.  Again, none of
the plaintiff's evidence rises to the requisite level of "the
most blatant remarks, whose intent could be nothing other than to
discriminate on the basis of [some improper factor] . . . ."
Carter, 870 F.2d at 582 (footnote omitted).  The law does not
mandate that an employer promote the best or the most able
candidate.  See, e.g., McCarthney v. Griffin-Spalding County Bd.
of Educ., 791 F.2d 1549, 1552 (11th Cir. 1986).  Although the
proffered evidence may suggest bad business judgment, such is not
the same thing as direct evidence of discrimination.  See id.
See also Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th
Cir. 1997).  Employers may legally engage in "differential
treatment" of employees without violating the law, so long as the
reason for the difference is not illegal.  Nix v. WLCY
Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir.
1984).  Furthermore, that permissible differential treatment need
not be based upon purely objective factors, but may include
subjective elements as well.  See, e.g., McCarthney, 791 F.3d at
1552 (11th Cir. 1999) (holding that "[t]he use of recommendations
does not, because they are subjective, require us automatically

to invalidate the [defendant] school system's promotion procedure").  In short, merely showing that the plaintiff was not treated the same as Flanders is not direct evidence of either discrimination or retaliation.

Having considered the type of evidence presented and having concluded that the plaintiff has offered only circumstantial evidence, the Court must now address the type of claims presented.  Plaintiff's Title VII claims involve allegations of illegal discrimination and retaliation.  Title VII provides generally that an employer shall not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's <u>race</u>, color, religion, sex, or national origin . . . ."  42 U.S.C. § 2000e-2(a)(1) (1994) (emphasis supplied).  In addition, certain forms of retaliation are also prohibited.  Specifically, Title VII prohibits covered employers from retaliating against any employee who "has opposed any practice made an unlawful employment practice by this subchapter [which includes 42 U.S.C. 2000e-2(a)(1)], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a) (1994).  Essentially the same analytical framework is

21

applied to Title VII claims premised on circumstantial evidence
of retaliation as to Title VII claims based on circumstantial
evidence of disparate treatment, although the articulation of
certain elements differs.  Compare Olmsted v. Taco Bell Corp.,
141 F.3d 1457, 1460 (11th Cir. 1998) (discussing elements and
burdens of production and proof in a Title VII retaliation
claim); Raney v. Vinson Guard Serv., Inc., 120 F.3d 1192, 1196-97
(11th Cir. 1997) (discussing the three-prong analysis applied to
retaliation cases); and Donnellon v. Fruehauf Corp., 794 F.2d
598, 600-01 (11th Cir. 1986) (applying the general Title VII
framework from McDonnell Douglas Corp. v. Green, 411 U.S. 792
(1973) to a retaliation case) with Combs, 106 F.3d at 1527-28
(discussing the general analytic guide in discrimination cases
under Title VII).

     "In evaluating Title VII claims supported by circumstantial
evidence, [the courts of this circuit] use the now-familiar
framework established by the United States Supreme Court in
McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817,
36 L. Ed. 2d 668 (1973), and Texas Department of Community
Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d
207 (1981)."  Combs, 106 F.3d at 1527.  Under the McDonnell
Douglas and Burdine framework, the Title VII plaintiff first has

22

the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally.  See id. at 1527-28.  The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather they are flexible and depend to a large degree upon the facts of the particular situation.  See, e.g., Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984); Lincoln v. Board of Regents of Univ. Sys., 697 F.2d 928, 937 (11th Cir. 1983).  In general, a plaintiff establishes a prima facie case of racial discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly.  See McDonnell Douglas, 411 U.S. at 802.

Once the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to proffer a legitimate and nondiscriminatory reason for its actions.  See Combs, 106 F.3d at 1528.  The employer's burden is so light as to be virtually weightless, meaning that the employer need merely put forth a legitimate reason for its actions and need not convince the court that the reason offered was the true, motivating force.  See

23

Tipton v. Canadian Imperial Bank of Commerce, 872 F.2d 1491, 1485
(11th Cir. 1989).  If the employer satisfies that burden by
articulating a nondiscriminatory reason, then the presumption of
discrimination falls and the burden of production again shifts to
the defendant to offer evidence sufficient for a reasonable jury
to conclude that the employer's supposedly legitimate reason is
merely a pretext for illegal discrimination.  Although the prima
facie case is irrelevant once the employer has offered a
legitimate reason for its actions, the evidence of pretext may
include the same evidence offered to establish the prima facie
case.  See Combs, 106 F.3d at 1528.  Despite this shifting of the
burden of production between the plaintiff and the defendant
under the McDonnell Douglas and Burdine framework, "[t]he
ultimate burden of persuading the trier of fact that the
defendant intentionally discriminated against the plaintiff
remains at all times with the plaintiff."  Texas Dep't of
Community Affairs v. Burdine, 450 U.S. 248. 253 (1981).  Given
that the ultimate burden of persuasion always lies with the
employee, a plaintiff may prevail on an employment discrimination
claim and may also defeat a summary judgement either by proving
that intentional discrimination did indeed motivate the defendant
or by producing sufficient evidence to allow a rational trier of

fact to disbelieve the employer's proffered legitimate reasons,
thus permitting but not compelling the trier of fact to make a
finding of illegal discrimination.  See St. Mary's Honor Ctr. v.
Hicks, 509 U.S. 502 (1993); Alexander v. Fulton County, 2000 WL
331384, at *23 (11th Cir. 2000); Combs, 106 F.3d at 1529-38
(interpreting Hicks and the post-Hicks case law); Hairston v.
Gainesville Sun Publ'g Co., 9 F.3d 913, 920-21 (11th Cir. 1993).

Having determined the proper framework for analysis, the
Court now turns to a consideration of the plaintiff's claims.
Here, the claims are better considered in reverse order.  The
Court, therefore, begins with those allegations relating to the
defendant's conditional offer of promotion.

**A. The Conditional Offer of Promotion**

Both parties agree that following new interviews after the
defendant's initial decision not to promote the plaintiff, the
defendant did offer the plaintiff a position as a neighborhood
services programmer, subject to certain conditions, which were
not placed upon the neighborhood services programmer offer made
to Joey Flanders, who is white.  (See Feb. 22, 2000 Order 2-3.)
The offer was contingent upon an agreement by the plaintiff to
submit to additional reviews to be conducted by Richard Liles at
three and six months and to participate in a writing skills class

25

or program to be selected by the plaintiff but for which the
defendant would pay.  (See Liles Dep. 102-15; Puckett Dep. 107-
08, 113.)  The parties disagree over the purpose and the effect
of these conditions.  Basically, the plaintiff argues that the
conditions imposed upon the offer as well as his proposed
assignment to the Calvary Hills Center rather than to his
preferred post at the Scruggs Center were motivated by racial
animus and by retaliation for prior grievances (including a
request for religious accommodation in scheduling) and were
illegal under Title VII.  However, the defendant argues that the
plaintiff cannot meet his prima facie case for either his race or
retaliation claim, and that even if he could, the defendant's
decisions were motivated by legitimate concerns, which plaintiff
has not shown to be pretexts for discrimination.  The Court will
consider the race claim and the retaliation claim separately.

**1. The Race Claim**

The plaintiff claims that race played a part in the
conditions placed upon the promotion offered him and in his
proposed assignment to the Calvary Hills Center instead of the
Scruggs Center.  Ordinarily, when one complains of discrimination
in promotion, a prima facie case requires evidence of the
following four elements:  (1) the plaintiff was a member of a

26

protected class; (2) the plaintiff was actually qualified for the position sought; (3) the plaintiff was rejected for the promotion; and (4) the position was filled by someone outside the plaintiff's class.  See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1333 (11th Cir. 1998) (citing Coutu v. Martin County Bd. of County Comm'rs, 47 F.3d 1068, 1073 (11th Cir. 1995)). Clearly, if the Court required plaintiff to meet these elements, he could not establish a prima facie case because he was not rejected for promotion to the position of neighborhood services programmer but, in fact, was offered the position, albeit subject to certain conditions and with an assignment to a center other than the plaintiff's favored site.[10]  However, as discussed

---

[10] Plaintiff argues that he was denied a promotion, because he claims that he applied for the neighborhood services programmer position at the Scruggs Center, to which his comparator, Joey Flanders, was assigned.  (See Pl.'s Br. 39.) Although the programmer position at Scruggs was vacant when the plaintiff applied for a promotion, the uncontroverted evidence establishes that the position was not site specific and that applicants were not guaranteed assignment to a particular center. (See Hughes Dep. 15-16; Position Class Specification for Neighborhood Services Programmer (Doc. 000806); Nov. 22, 1996 Hatfield Mem. 1.)  The evidence also establishes that two programmer positions were open; the initial decision had been to fill only one of the openings, but upon re-interviewing the candidates, Richard Liles decided to fill both jobs.  (See Liles Dep. 75.)  In short, the plaintiff was competing not for the Scruggs Center position but simply for a position as a neighborhood services programmer, which he was offered.

above, the articulation of the elements of any prima facie case of employment discrimination is not fixed.  See Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984).  "The specific proof required for a prima facie case will vary from case to case."  Lincoln v. Board of Regents of Univ. Sys., 697 F.2d 928, 937 (11th Cir. 1983) (italics omitted). Stated differently, because each case of alleged discrimination is unique, the court is to work within the McDonnell Douglas framework in articulating elements that speak to the circumstances of the particular case.  See Nix, 738 F.2d at 1185. Looking to the general McDonnell Douglas elements, plaintiff, to satisfy his prima facie case, must present evidence (1) that he was a member of a protected class; (2) that he was qualified for a promotion to neighborhood services programmer; (3) that his offer of promotion was subject to certain adverse conditions; and (4) that the conditions to which his offer was subject were not attached to an offer of promotion to an otherwise similarly situated person outside plaintiff's class.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

Even with the elements more closely tailored for the plaintiff's situation, the Court is not convinced that the plaintiff has met his prima facie case.  The Court accepts that

28

the plaintiff belongs to a protected class and that he was at least minimally qualified for the position; indeed, the defendant has not sought to contest those two elements. However, the third and the fourth requirements are troubling.

Under McDonnell Douglas, the plaintiff must be subject to an adverse employment action. See id. Certainly, an outright denial of a promotion would qualify. See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1333 (11th Cir. 1998) (listing the elements for a prima facie case of discriminatory failure to promote). Here, though, plaintiff was offered a conditional promotion. The crucial consideration, therefore, is whether those conditions could be considered so onerous as to make the offer of promotion, which by itself is a favorable decision, an adverse employment action. The Court does not dispute that the plaintiff considered the conditions, including the proposed assignment to Calvary Hills, to be adverse, but the plaintiff's subjective dislike for the terms of the offered promotion is not relevant to the finding of adversity; the proper standard calls for a determination of whether the action was objectively adverse as viewed by a reasonable employee. See Maniccia v. Brown, 171 F.3d 1364, 1369-70 n.3 (11th Cir. 1999) (noting that a finding of an adverse employment action was not warranted when the only

supporting evidence was the plaintiff's claim that she considered the transfer in question to be a demotion); Doe v. Dekalb County Sch. Dist., 145 F.3d 1441, 1449 (11th Cir. 1998) (concluding after examining the concept of "adverse employment action" as applied generally in employment discrimination cases that a "plaintiff must demonstrate that a reasonable person in his position would view the employment action in question as adverse"); Smith v. Alabama Dep't of Pub. Safety, 64 F. Supp. 2d 1215, 1221 (M.D. Ala. 1999) ("[T]he mere fact that an employee dislikes his or her employer's action is not sufficient to establish the element of adverse employment action required in employment discrimination cases."); Perryman v. West, 949 F. Supp. 815. 819 (M.D. Ala. 1996) ("[A]n employment action must affect a term or condition of employment and is not adverse merely because the employee dislikes it or disagrees with it."). In the instant case, the Court cannot find that a reasonable employee would view the conditions and site assignment associated with the plaintiff's offer to be adverse under the circumstances.

Two conditions were placed upon the plaintiff:  that he participate in a writing skills program, selected by him but funded by the defendant, and that Richard Liles evaluate the plaintiff at three months and at six months, in addition to the

normal six month and one year reviews by the plaintiff's more
immediate superiors.  (See Liles Dep. 103-04; Puckett Dep. 107-
08.)  The writing program was envisioned as a short-term, one-on-
one course of private tutoring designed to help the plaintiff
improve his written communication skills, which skills are listed
as a requirement for the programmer position (along with the
ability to prepare reports from a variety of sources) and which
skills plaintiff has admitted are used in the job, after Liles
found the plaintiff's writing to lack detail.  (See Liles Dep.
113-15, 121-23; Pennington Handwritten Notes (Doc. 000320);
Pennington Dep. 90-91; Neighborhood Services Programmer Position
Class Specification 2.)  Many employers condition promotion on
the completion of a course designed to improve necessary job
skills, and no reasonable employee would view such a requirement
as objectively adverse.  Cf. Doe, 145 F.3d at 1452-53 (finding
that condition, imposed as a result of involuntary transfer, that
teacher obtain ten hours of credit toward teaching certificate in
specialization different from her previous area was not
objectively adverse).  The second condition of three and six
month evaluations would not, as plaintiff apparently has argued,
have imposed on plaintiff additional formal performance reviews;
rather, the so-called "evaluations" were merely to allow a

31

structure in which Liles could provide the plaintiff with feedback and suggest possible solutions or offer assistance as the plaintiff attempted to adjust to his new duties and through which Liles could ensure that the plaintiff would not suffer any retaliation for his prior religious accommodation.  (See Liles Dep. 104-11.)   Again, no reasonable employee could find these feedback sessions, designed to assist in the transition to the new position and to reduce the possibility of real retaliation, as objectively adverse.

Furthermore, the plaintiff's proposed assignment to the Calvary Hills Center rather than to his preferred location, the Scruggs Center, to which a white comparator (Joey Flanders) was assigned, did not make the offer an adverse employment action. The only arguments that the plaintiff has even remotely raised to suggest that the Calvary Hills assignment was adverse are that he had not previously worked at that center; that he had worked at the Scruggs Center; that he applied for the promotion in order to work at Scruggs; that the Calvary Hills center had more rowdy patrons; that had he not been assigned to Calvary Hills, which had some different programs than did Scruggs, the conditions placed on his promotion, supposedly, would not have been necessary; and that no reason prevented Flanders's assignment to

32

Calvary Hills rather than to Scruggs.  Although the plaintiff
attacks the wisdom of the defendant's business judgment regarding
its employee assignments, which courts rightfully will not
normally review,[11] he makes no showing that would support a
finding of an objectively adverse action.  No evidence suggests
that a promotion to a position at the Calvary Hills Center would
have entailed less pay or prestige or fewer benefits than an
assignment elsewhere or that, because of the different programs
or the presence of more rowdy patrons, the duties required of the
programmer at Calvary Hills would have been more demeaning or
even more demanding than at Scruggs.  Cf. Maniccia, 171 F.3d at
1369-70 n.3 (finding no support for an adverse employment action
where no evidence was presented that the plaintiff's transfer to
a different duty assignment would involve a reduction in pay or
benefits); Doe, 145 F.3d at 1452 (citing cases and noting that
transfers resulting in reduced pay or responsibility or prestige
or that undercut the affected employee's professional development
are adverse employment actions); Evans v. McClain of Ga., Inc.,

---

[11] In a slightly different context, the Eleventh Circuit has
written that an employer's "decision . . . may seem to some to be
bad business judgment, and to others to be good business
judgment, but federal courts do not sit to second-guess the
business judgments of employers." Combs v. Plantation Patterns,
106 F.3d 1519, 1543 (11th Cir. 1997).

131 F.3d 957 (11th Cir. 1997) (concluding that plaintiff had
established prima facie case of failure to promote where
"promotion" resulted in constantly changing job assignments and
performance of "demeaning and menial tasks"); McCabe v. Sharrett,
12 F.3d 1558, 1564 (11th Cir. 1994) (finding that transfer to
lower ranking position involving less prestige and more menial
work but without pay decrease was an adverse employment action).
At best, the plaintiff has established that the two centers
differed in certain respects but has failed to show that one
center was better than the other, much less show that Calvary
Hills was so undesirable as for an assignment there to constitute
an adverse employment action.

In addition to not presenting any evidence of an adverse
employment action associated with the conditional offer of
promotion, the plaintiff has failed to satisfy the fourth element
of his prima facie case, which requires some showing that an
otherwise similarly situated employee outside the plaintiff's
class was treated dissimilarly. See McDonnell Douglas Corp. v.
Green, 411 U.S. 792, 802 (1973). Plaintiff makes much of the
fact that the conditions placed upon his promotion were not also
placed on the promotion given Flanders. However, dissimilar
treatment is not synonymous with discrimination. As the Eleventh

34

Circuit recently acknowledged:

> Every employment decision involves discrimination.  An
> employer, when deciding who to hire, who to promote,
> and who to fire, must discriminate among persons.
> Permissible bases for discrimination include education,
> experience, and references. . . . Thus, in an
> employment discrimination suit, the key question
> usually is:  On what basis did the employer
> discriminate?

Wright v. Southland Corp., 187 F.3d 1287, 1289 (11th Cir. 1999).

An employer who makes a distinction between employees because

that employer believes the employees are not similarly situated

does not discriminate on an impermissible basis.  See Jones v.

Gerwens, 874 F.2d 1534, 1540-41 (11th Cir. 1989); Nix v. WLCY

Radio/Rahall Communications, 738 F.2d 1181, 1186-87 (11th Cir.

1984) (finding that the plaintiff had failed to demonstrate a

prima facie case where he had failed to show that his purported

comparator was actually similarly situated).  The conditions

imposed upon the offer made to the plaintiff were not imposed on

the offer made to Flanders because the decision-maker, Richard

Liles, did not believe they were necessary with Flanders.  (See

Liles Dep. 104.)  Although Liles had concerns over the

plaintiff's writing ability and over his ability to become

involved in the community based programs administered through the

recreation center, the same concerns were not present with

Flanders, who was considered to have good communication skills and who had put forth new ideas for the Scruggs Center.  (<u>See</u> Liles Dep. 79-81, 1005-06, 113-15, 121-22.)  The plaintiff was treated in a different manner from Flanders because they were not viewed as similarly situated.

Even granting that the plaintiff established an at-best-weak prima facie case of race-based disparate treatment, the defendants have articulated legitimate, nondiscriminatory reasons for placing conditions on the plaintiff's promotion and for assigning him to the Calvary Hills Center rather than to the Scruggs Center, but the plaintiff has failed to offer any significant evidence from which a rational trier of fact could choose to disbelieve all of the defendant's explanations as mere pretext.  <u>See</u> <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1228-29 (11th Cir. 1997) (analyzing the burdens of proof and production in a Title VII disparate impact case based upon circumstantial evidence).  As just discussed, the conditions attached to the plaintiff's offer were based upon the decision-maker's stated concerns over the plaintiff's skill in writing and over the plaintiff's ability to go beyond his previous role and become involved in the community based programs offered through the recreation center.  The site assignment was based on the

decision-maker's overall evaluation of the fit between the two

centers and the respective skills of the plaintiff and his

comparator, and in particular, the comparator's better

communication skills and his ideas for the Scruggs Center.   (See

Liles Dep. 79-80.)   Although the plaintiff has advanced a number

of arguments in an attempt to demonstrate some basis from which

an inference of pretext could be drawn,[12] the plaintiff's attack

_____

[12] The plaintiff has attacked the subjectiveness of Richard
Liles's evaluation of the writing samples and the criteria used
to match programmers to recreation centers, but the use of
subjective components in making personnel decisions is not per se
impermissible, and plaintiff has failed to make any significant
showing that the decision-maker used race or another prohibited
factor in making his evaluations of the candidates for the
positions.   See McCarthney v. Griffin-Spalding County Bd. of
Educ., 791 F.2d 1549, 1552 (11th Cir. 1986).   Indeed, subjective
factors, such as ability to work with others or to take direction
or to communicate effectively, often combine with more objective
criteria to play an important overall role in an employer's
decision.   Although the courts of this circuit have required
greater specificity when subjective factor are used in taking an
employment action, they do not typically question purported
legitimate business judgments except when the employee has met
his prima facie case and the employer attempts to rely solely on
highly subjective reasons that are not capable of independent
support or are not capable of objective evaluation and upon which
the employee has cast substantial doubt as to their truth.   Only
then is the finder of fact permitted to evaluate the legitimacy
of the employer's use of the subjective factors at issue.   See
Carter v. Three Springs Residential Treatment, 132 F.3d 635, 643-
45 (11th Cir. 1998); Hill v. Seaboard Coast Line R.R. Co., 885
F.2d 804, 808-09 (11th Cir. 1989); Miles v. M.N.C. Corp., 750
F.2d 867, 871-72 (11th Cir. 1985); Fowler v. Blue Bell, Inc., 737
F.2d 1007, 1011-12 (11th Cir. 1984).   The plaintiff also takes
issue with the fact that the decision-maker used multiple

is essentially on the wisdom, rather than any improper, race-based motivation, underlying the defendant's actions.  Title VII, though, does not mandate that employers make smart or even fair choices in their personnel decisions.  "The employer may [make a decision regarding] an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."  See Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984).  Only where the merits of the employer's choice and the proffered reasons are so utterly dubious that no remotely reasonable employer would make the same selection in the absence of illegal considerations, will courts begin to question the

criteria and had some difficulty in recalling specific details concerning his reliance on several proffered, permissible factors.  That the decision-maker had difficulty four years later remembering certain details concerning specific promotion and placement considerations is irrelevant because the criteria that Liles did remember in detail have not been rebutted by the plaintiff.  See Combs, 106 F.3d at 1543 (noting that to avoid summary judgment, a plaintiff must "produc[e] evidence sufficient to discredit in the mind of a reasonable juror all of the defendant's proffered nondiscriminatory reasons for its actions") (emphasis added).  Furthermore, the criteria that could not be recalled in detail were all legitimate reasons that would justify the defendant's actions and, therefore, cannot be a basis for finding pretext.  See Carter v. Tidwell Prods., 135 F.3d 1422, 1428 (11th Cir. 1998) (noting that "the existence of a possible, additional non-discriminatory basis for [the employer's actions] does not, however, prove pretext").

defendant's poor business judgment.   See Combs, 106 F.3d at 1543.
Cf. Deines v. Texas Dep't of Protective and Regulatory Servs.,
164 F.3d 277, 281-282 (5th Cir. 1999) (approving jury
instructions that the jury's place is not "simply to second guess
the defendant's hiring decision as to which candidate was best
qualified or best suited for the job" and that "disparities in
qualifications are not enough in and of themselves to demonstrate
discriminatory intent unless they are so apparent as virtually to
jump off the page and slap you in the face" because "[t]here is
then, for the purposes of proving pretext, a difference in simply
'second-guessing' an employer's judgment and finding proof of
mendacity").  Although the plaintiff may have been the better
candidate for the position at the Scruggs Center and although
Liles may have been mistaken in his low opinion of the
plaintiff's writing ability and in his concerns over plaintiff's
ability to move beyond his former job without additional
guidance, viewing all of the evidence in the light most favorable
to the plaintiff, the Court cannot conclude that the he has
produced evidence sufficient enough to allow a reasonable finder
of fact to conclude that discrimination was the defendant's true
motive or that the defendant's judgments regarding the need to
condition the offer of promotion made to the plaintiff or to

assign the plaintiff to a center other than his first choice were so clearly irrational that the only sensible explanation for them would be discrimination.

## 2. The Retaliation Claim

Plaintiff, apparently, attempts to assert a separate Title VII claim of retaliation for prior complaints regarding religious accommodation, which claim also allegedly arises from the defendant's conditional offer of promotion to the neighborhood services programmer position.[13] "To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events." Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998) (citing Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994)).  The first element is not in dispute.  However, as discussed in the previous section, plaintiff has not demonstrated that any objectively adverse employment action was taken and, therefore, has failed to meet the second element of his prima facie case.

---

[13] At various times, the plaintiff has suggested additional protected activities as bases for retaliation but has not argued or even developed the evidence of those other, possible grounds.

In addition, were plaintiff subjected to an adverse employment action, he still has not satisfied the remaining element of a causal link.  First, the defendant or its relevant agent must be aware of the protected activity at the time of the decision.  See Raney v. Vinson Guard Serv., Inc., 120 F.3d 1192, 1197-98 (11th Cir. 1997).  See also Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999) (listing the employer's awareness as a separate element of the prima facie case).  Here, Richard Liles, the decision-maker, was aware of plaintiff's past complaints and had been involved in the process of trying to accommodate plaintiff's religious beliefs in 1994.  However, the timing of those complaints relative to Liles's 1996 decisions to condition the plaintiff's promotion and to assign plaintiff to the Calvary Hills Center does not support the existence of the required causal nexus between the employee's activity and the employer's action.  "Far from demonstrating a pattern of retaliatory activity, these two employment actions were isolated events that had no temporal relationship to [plaintiff's] protected activity." Maniccia, 171 F.3d at 1370.  Simply put, the two years that elapsed between the plaintiff's complaints and Liles's decisions represent too long a period without reprisal to suggest a causal link.  See id. at 1369-70 (finding that gaps of

41

15 and 21 months between the employee's and the employer's
respective actions were too great to support a causal nexus and
citing additional cases finding a lack of causal link following
even shorter intervals).  See also Conner v. Schnuck Mkts., Inc.,
121 F.3d 1390, 1395 (10th Cir. 1997) (finding that a gap of a
mere four months between the protected activity and the
employer's action did not show a causal link); McClure v.
Cywinski, 686 F.2d 541, 546 (7th Cir. 1982) (finding that three
and a half month lapse between comments and employment action
undercut causation element).  Cf. Farley v. Nationwide Mut. Ins.
Co., 197 F.3d 1322, (11th Cir. 1999) (finding causal link
demonstrated where employee was discharged seven weeks after
engaging in protected conduct); Wideman v. Wal-Mart Stores, Inc.,
141 F.3d 1453, 1457 (11th Cir. 1998) (finding causal link
supported where "adverse employment actions commenced almost
immediately after management learned" that employee had
participated in protected activity); Donnellon v. Fruehauf Corp.,
794 F.2d 598, 601 (11th Cir. 1986) (finding that interval of one
month between protected activity and employer's action supported
causation).

    Furthermore, even assuming a prima facie case of retaliation
under Title VII, the defendant has offered several legitimate,

42

nondiscriminatory reasons for its decisions, which reasons have not been rebutted by the plaintiff.  The defendant's explanations for its decisions have been discussed at great length in the immediately preceding section and need not be repeated here. Again, plaintiff more or less has questioned the soundness of the conditions placed on his promotion and the planned assignment to the Calvary Hills Center but has failed to offer any significant evidence of pretext (not already discussed in the previous section) from which a rational trier of fact could find an improper motivation on the part of the defendant.  Cf. Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997).  In a case such as this, "[w]here the defendant's justification evidence completely overcomes any inference to be drawn from the evidence submitted by the plaintiff, the district court may properly acknowledge that fact and award summary judgment to the employer."  Grigsby v. Reynolds Metals Co., 821 F.2d 590, 597 (11th Cir. 1987).  Accordingly, the Court finds that defendant is entitled to summary judgment as to both the discrimination claim and the retaliation claim premised on the events surrounding the conditional offer of promotion extended to plaintiff.

**B. The Initial Failure to Promote**

    Now the Court turns to the remainder of the plaintiff's

43

case.  Apart from the claims already analyzed, plaintiff has
brought two additional Title VII claims based upon the
defendant's initial decision not to offer plaintiff a promotion
to the position of neighborhood services programmer in June of
1996.  He alleges both retaliation for his previous grievances
concerning religious accommodation and disparate treatment
because of race.  The Court will consider the retaliation theory
first.

**1. The Retaliation Claim**

Initially, plaintiff must establish a prima facie case of
retaliation; here, plaintiff has failed to do so.  Generally, to
establish a prima facie case of retaliation, a Title VII
plaintiff must present some evidence tending to show each of the
following:  (1) that the plaintiff engaged in a protected
activity; (2) that subsequent to that participation, the
plaintiff suffered an adverse employment action; and (3) that a
causal nexus existed between the protected activity and the
adverse employment action.  See Raney v. Vinson Guard Serv.,
Inc., 120 F.3d 1192, 1196 (11th Cir. 1997).  The first element is
not in dispute.  However, the Court finds that plaintiff has
failed to satisfy either the second or the third element.

Determining whether the plaintiff actually suffered an

44

adverse employment action presents the more difficult question.
Although the defendant's initial decision was not to offer
plaintiff a promotion, that decision was swiftly reversed
following the plaintiff's complaints to the defendant's Equal
Employment Officer, Mia Puckett, and he was soon offered a
promotion to the position originally sought.  The Court's natural
inclination is to find no adverse employment action as the
plaintiff was quickly offered the desired promotion.  The Court
recognizes, though, that it must be guided not by its intuition
but by the Eleventh Circuit's recent decision in <u>Wideman v. Wal-
Mart Stores, Inc.</u>, 141 F.3d 1453 (11th Cir. 1998).  In <u>Wideman</u>,
the court of appeals held "that Title VII's protection against
retaliatory discrimination extends to adverse actions which fall
short of ultimate employment decisions."  <u>See</u> <u>Wideman</u>, 141 F.3d
at 1456.  But, the court also acknowledged "that there is some
threshold level of substantiality that must be met for unlawful
discrimination to be cognizable under the anti-retaliation
clause," yet it failed to announce or offer any standards by
which to gauge that minimum "level of substantiality."  <u>See</u> <u>id.</u>

     In analyzing whether plaintiff actually suffered an adverse
employment action despite the fact that the initial decision not
to offer him a promotion was quickly reversed, this Court

considers not only <u>Wideman</u> and similar cases contemplating the

concept of adverse employment action but also the purpose and

spirit of employer-maintained Equal Employment Opportunity

programs, such as the one to which plaintiff complained upon

learning of the defendant's short-lived first decision.  Starting

with the case law, the Court finds no support for an adverse

employment action.  The facts of <u>Wideman</u> itself are egregious;

the plaintiff was given undeserved reprimands, she was required

to work without lunch and to work on days on which she was not

scheduled, fellow employees were canvassed for negative comments

about the plaintiff, the defendant improperly delayed in

authorizing needed emergency medical treatment for the plaintiff,

and an assistant manager threatened to shoot plaintiff.  <u>See id.</u>

at 1455.  Clearly, the facts of the instant case do not even

suggest the level of adversity suffered by the plaintiff in

<u>Wideman</u>.  Much more analogous to the present matter is <u>Blalock v.</u>

<u>Dale County Bd. of Educ.</u>, 84 F. Supp. 2d 1291 (M.D. Ala. 1999).

In <u>Blalock</u>, as in the instant case, the defendant employer

swiftly rescinded an earlier decision (an allegedly

disadvantageous transfer) and the court found no adverse

employment action.  <u>See</u> <u>Blalock</u>, 84 F. Supp. 2d at 1309-11

(discussing <u>Wideman</u> and <u>Graham v. State Farm Mut. Ins. Co.</u>, 193

F.3d 1274 (11th Cir. 1999)).

Most analogous is Shabat v. Blue Cross Blue Shield, 925 F. Supp. 977 (W.D.N.Y. 1996), aff'd sub nom., Shabat v. Billotti, 108 F.3d 1370 (2d Cir. 1997). In Shabat, the plaintiff claimed that disparate treatment because of national origin and religion had resulted in a failure to promote, but the court found no adverse action because the plaintiff had, in fact, received a promotion. See Shabat, 925 F. Supp. at 987. The plaintiff's real complaint was that he had not been offered a promotion sooner and that the promotion came about only because the plaintiff had confronted his superior, charging that plaintiff had heard that the supervisor had decided never to promote him. See id. The delay in the eventual promotion, which advancement may have been precipitated by the plaintiff's challenge to his supervisor, did not constitute an adverse employment action. See id. Given that the plaintiff here, like the employee in Shabat, was swiftly offered a promotion after voicing his concerns and given that the plaintiff suffered no real consequences from the initial contrary decision, Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1284 (11th Cir. 1999) (adopting the district court's opinion finding of no adverse employment action where "plaintiff did not suffer any repercussions"), the Court finds

47

that, at worst, Pennington suffered a delay in his promotion, which did not rise to the level of substantiality required for an adverse employment action.

The Court's finding of no adverse employment action is further bolstered by a consideration of the purpose behind independent, employer-maintained Equal Opportunity Offices, such as the program run by the defendant.  The obvious idea is to provide an early forum to which employees may turn with their concerns so that potentially impermissible practices may be addressed before any injury occurs.  That system worked precisely as designed in the case at bar:  plaintiff voiced his concerns over the defendant's initial decision, that decision was quickly reversed, and the plaintiff was offered the position he had sought.  In short, the goal of equal employment was served in the plaintiff's case.  A finding of an adverse employment action would violate the spirit of Title VII and would vitiate an important component of the intended enforcement system.  <u>See</u>, <u>e.g.</u>, <u>McCarthney v. Griffin-Spalding County Bd. of Educ.</u>, 791 F.2d 1549, 1553 (11th Cir. 1986) ("Nothing in Title VII prevents an employer from attempting to solve disputes amicably.  Indeed Title VII prefers informal settlement of disputes.").

Additionally, plaintiff has failed to show a causal link

between his protected activity and the defendant's actions.  As
discussed in the previous section, the amount of time that
elapsed between the plaintiff's complaints concerning his
requested religious accommodation in 1994 and the defendant's
decisions regarding the neighborhood services programmer position
in 1996 is simply too great to support a causal nexus between the
two events.  See Maniccia v. Brown, 171 F.3d 1364, 1369-70 (11th
Cir. 1999).  The only other evidence which plaintiff has
presented that could fairly be said to show some causal link
between the plaintiff's protected activities and the defendant's
initial decision is the explanation that Tony Hughes supposedly
gave to Mia Puckett about the factors considered.  However, the
Court has already concluded that Puckett's interpretation of
Hughes's statements was in error.  Hughes did not look at the
plaintiff's grievances regarding religious accommodation, but
rather considered his poor reaction to a transfer, which was only
coincidentally connected to the religious accommodation provided
plaintiff.  In summary, the plaintiff has not offered any
significant evidence of a causal link or an adverse employment
action and, therefore, he has not made his prima facie case; this
failure entitles the defendant City of Huntsville to summary
judgment as to the plaintiff's retaliation claim arising from the

initial but swiftly rescinded decision not to offer plaintiff a promotion to the position of neighborhood services programmer.[14]

## 2. The Race Claim

Little need be said about plaintiff's remaining claim.  In general, a prima facie case of disparate treatment in failing to promote requires the plaintiff to show the following elements: (1) that the plaintiff belonged to a protected class; (2) that the plaintiff was qualified for the desired promotion; (3) that the plaintiff was rejected; and (4) that the position was filled with a person outside the relevant protected class.  See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1333 (11th Cir. 1998) (citing Coutu v. Martin County Bd. of County Comm'rs, 47 F.3d 1068, 1073 (11th Cir. 1995)).  Here, the plaintiff cannot meet the third prong of his prima facie case because he was, in fact,

---

[14] Although not required to decide this case, the Court notes that the defendants did have legitimate, nondiscriminatory reasons for initially selecting plaintiff's comparator, Joey Flanders, for promotion.  According to the de facto decision-maker, Tony Hughes, the initial decision was based on his limited personal knowledge of the candidates, their responses to interview questions, and the contents of their personnel files. (See Hughes Dep. 45-46.)  Hughes was particularly impressed with Flanders because he had received highly favorable evaluations from two different supervisors.  (See Hughes Dep. 46.)  In contrast, the plaintiff's personnel file contained two reprimands, one for taking leave without approval and one for tardiness to and sleeping during a mandatory training session. (See Docs. 0000162-63.)

offered a promotion to the position sought.  Even if the Court

were, as it did in Section 1 of Subpart A of Part IV of this

opinion, to reformulate the specific prima facie requirements

under McDonnell Douglas to better reflect the particular

circumstances of this case, the plaintiff still would not be

allowed to proceed.  McDonnell Douglas requires a showing that

some adverse employment action was taken against the plaintiff

and that otherwise similarly situated employees of a different

race were treated dissimilarly.  See McDonnell Douglas Corp. v.

Green, 411 U.S. 792, 802 (1973).  First, as just discussed in the

preceding section, plaintiff has not shown that he suffered any

adverse employment action as a result of the defendant's initial

decision.  Furthermore, the plaintiff has failed to demonstrate

that he was truly similarly situated to his purported comparator.

See, e.g., Nix v. WLCY Radio/Rahall Communications, 738 F.2d

1181, 1186-87 (11th Cir. 1984) (finding that the plaintiff had

not met his prima facie case because he had not demonstrated that

the he was similarly situated to any differently treated

employees).  Finally, plaintiff has offered absolutely no other

evidence even remotely suggesting a racially biased motive in the

defendant's initial decision.  Succinctly put, the plaintiff has

utterly failed to demonstrate any support for his race claim

premised upon the defendant's abruptly reversed first decision, and defendant is due summary judgment.

### V. Conclusion

In conclusion, the Court holds that no material issues of fact remain and that defendant City of Huntsville is entitled to judgment as a matter of law as to all of the plaintiff's claims. A separate order consistent with the findings detailed in the memorandum of opinion will be entered.

DONE this ___24ᵗʰ___ day of April, 2000.

_____
SENIOR UNITED STATES DISTRICT JUDGE

52